IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHAWN RILEY,

                Plaintiff,

v.

CHAPLAIN EWING,

                Defendant.

OPINION and ORDER

15-cv-592-jdp

---

Pro se prisoner Shawn Riley is proceeding on a claim that defendant David Ewing, the chaplain at Wisconsin Secure Program Facility, failed to accommodate his request to fast during the month of Ramadan, in violation of his rights under the First and Eighth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act. Before the court are the parties' cross-motions for summary judgment, Dkt. 19 and Dkt. 25, as well as several motions filed by Riley requesting that the court rule on outstanding motions and recruit counsel to represent him. Dkts. 41, 44, 45, 48, 49, 53, 61, 63, 64, and 66. For the reasons below, I will grant Ewing's motion for summary judgment and will deny all of Riley's motions.

UNDISPUTED FACTS

**A. The parties**

Plaintiff Shawn Riley has been incarcerated at Wisconsin Secure Program Facility since September 2011. He is Muslim. Defendant David Ewing has been the chaplain at WSPF since 2013.

**B. Ramadan observance in Wisconsin prisons**

Islamic inmates incarcerated in the Wisconsin Department of Corrections may participate in the Islamic celebration of Ramadan, which is held during the ninth month of the Islamic lunar calendar. During this month, Muslims around the world spend the daylight hours in a complete fast. Muslim inmates incarcerated in the DOC may participate in the Ramadan fast by submitting a request to the prison chaplain. Inmates who sign up for the fast are provided meal bags during non-fasting hours that contain a day's worth of food, to be eaten after sunset and before sunrise. Under Division of Adult Institution policy 309.61.03, which applies to all adult institutions in the DOC, inmates must sign up for any multiday consecutive religious dietary observance (such as Ramadan or Passover) at least 60 days in advance. Any inmate who misses the signup deadline cannot participate in the religious dietary observance. Under the policy, the DOC's Religious Practices Advisory Committee, which is comprised of representatives of community religious groups and DOC staff, is responsible for issuing a memo each year that identifies the timeframe for Ramadan and the deadline for signing up. (The policy does not specify who is to receive the memo.)

DOC institutions can make certain limited exceptions to the 60-day signup rule. An institution may excuse an untimely signup request if there were special circumstances affecting an inmate's ability to meet the signup deadline, such as if an inmate was out of the institution in the hospital for an extended period of time. Additionally, at WSPF, if an inmate is transferred to the prison either during Ramadan or within the 60 days prior to Ramadan and tells Chaplain Ewing that he signed up for Ramadan at the prior institution, Ewing verifies the information with the prior institution's chaplain. Once verified, the inmate can be provided

Ramadan meals at WSPF. Exceptions to the 60-day rule are rare at WSPF, occurring approximately three times a year.

**C. Planning for Ramadan**

In fiscal year 2017, DOC served 25.7 million meals at an average cost of $1.01 per meal. At WSPF, Food Services prepares three meals a day for approximately 500 inmates. Most inmates receive either a general fare meal, plant-based meal, halal meal, or kosher meal, based on previously approved requests. Inmates may also receive a medical diet created in consultation with a dietician and the Health Services Unit. Food production at the prison is a large-scale operation that requires months of careful planning to avoid shortages and waste and to ensure that the nutritional needs of the inmates are met.

Planning for Ramadan requires considerable advance planning. The content of Ramadan meal bags is different than the regular meals because it is intended to be eaten without being warmed up and needs to last until the morning. Every year during Ramadan, Food Services at WSPF must change the general institution menu recipes (including the general fare, halal, and plant-based recipes) to make smaller amounts of food to account for the approximately 75 inmates who will participate in Ramadan. Food Services must also finalize a menu for all three diets (general, plant-based, and halal) for the Ramadan meals. There may also be individual medical concerns to take into account, depending on who is participating in Ramadan, such as low-sodium or low fat/cholesterol diets or food allergies.

Food Services at WSPF starts planning for Ramadan approximately three months in advance. DOC can estimate quantities of food needed for Ramadan based on the prior years' data, but participation can vary significantly from year to year. From 2011 to 2016, WSPF had between 61 and 84 inmates participating in Ramadan. By requiring inmates to sign up for

Ramadan at least 60 days in advance, Food Services is able to order the right amount of food, with enough time at each institution to provide timely, religiously appropriate meals to Ramadan participants. The 60-day signup deadline also enables DOC to order the correct quantities of food for those inmates not participating in Ramadan without significant food budget overages.

To finalize the menus, Food Services submits the month-long Ramadan menus to DOC's dietetic services director, Christine Berndt-Miles, for approval for budgeting purposes and to ensure caloric and nutritional requirements are met. Berndt-Miles reviews the menus and considers whether any changes are needed based on product availability, ingredients, packaging, or updates to nutritional standards or serving sizes. If Berndt-Miles finds that a Ramadan menu is satisfactory, she may be able to approve it the same day she reviews it. But if the menu needs adjustments, there may be significant back and forth with Food Services at the institution to address any issues.

Once the menus are approved and finalized, DOC provides the menus to its vendors, preferably four to eight weeks in advance of when DOC will order the food. Once food is ordered, it can take up to four weeks for an institution to receive the orders, depending on order quantity and whether products are readily available. At WSPF, Ramadan food is thawed up to two weeks in advance. Ramadan meals are prepped three to four days before they are delivered to inmates. Food Services prepares Ramadan meals only for those inmates who signed up in advance to participate and does not prepare extra Ramadan meals. The only reason there would be extra Ramadan meals on any given day would be if an inmate chose to stop participating in Ramadan or if an inmate participating in Ramadan was transferred to another institution.

**D. Riley's participation in Ramadan**

Riley was housed in the restrictive housing unit at WSPF between 2011 and 2015. In 2013 and 2014, he submitted requests to Ewing to participate in Ramadan more than 60 days in advance, and he was able to participate in Ramadan. According to Riley, WSPF had announced the signup deadline in those years by sending out a memo to inmates or broadcasting the dates on the institution's television system. (There is no evidence in the record regarding who sent the memo to the inmates or who was responsible for the television broadcasts.)

In 2015, WSPF posted the dates for religious multiday observances and annual celebratory meals on all units housing general population inmates. (At the time, DAI policy 309.61.03 did not require prisons to provide notice of the signup deadline to inmates. Dkt. 29-1. This changed in 2016. Prisons are now required to provide notice of the signup deadline, including posting the deadline in the institution chapel, in general population units, and, at the warden's discretion, in restrictive housing units, on institution televisions, and in other locations. Dkt. 29-4.) Riley was housed in the restrictive housing unit in 2015, where there were no bulletin boards that contained notice of the Ramadan dates. WSPF also did not announce the signup deadline on the institution televisions in 2015. DOC held the Ramadan fast from June 18, 2015 to July 18, 2015. The deadline to sign up was April 19, 2015. Riley submitted his request on May 12, 2015, and Ewing denied the request as untimely.

After Ewing denied his request, Riley submitted a note to Ewing dated May 14, 2015, stating he was never informed of the signup deadline. Ewing responded that it was up to Riley to know the dates of his religious observances and that Riley could contact Ewing anytime he had a question about dates. Riley later spoke to Ewing at his cell and asked whether the kitchen

5

could send an extra Ramadan meal bag to Riley's cell during the month of Ramadan. Ewing told Riley that because he had not asked to participate before the signup deadline, he would not be added to the Ramadan list.

Although Riley did not have access to the bulletin boards in the general population units, Riley could have learned about the Ramadan signup deadline in other ways. The DAI policies, including 309.61.03, were available in the law library. (Riley attempts to dispute whether 309.61.03 was available in the law library, but he cites no evidence supporting his statement that the policy was not in the library. For example, he does not say that he looked for the policy in the library and did not find it or that library staff told him the policy was unavailable.) If he was unsure about the dates Ramadan would be observed, Riley could have asked other inmates, family members, or unit staff about the dates so that he could calculate the signup deadline himself. Riley could have asked Ewing about Ramadan during Ewing's daily rounds in the segregation unit, or Riley could have submitted an interview/information request to Ewing asking about the signup deadline. Ewing receives many inquiries and information requests from inmates regarding religious observances and signup deadlines, but Riley never asked Ewing about the Ramadan dates or signup deadline.

Because Riley did not sign up to receive Ramadan meal bags in 2015, he received his regular institution meals each day during the month of Ramadan. On the first night of Ramadan, Riley asked an officer whether there were any leftover meal bags and if so, whether he could have them during the month of Ramadan. The officer told Riley that he would check for any extra Ramadan meals and seek permission from Ewing to give the meals to Riley. Later that night, Ewing came to Riley's cell and told him that Food Services would not send Riley extra Ramadan meals.
6

During Ramadan, Riley attempted to conduct a "self-reliant" fast by preserving some of the food items from his regular meal trays until nightfall. Riley was able to preserve only a limited amount of food because some of the items were perishable and others did not fit into the single bowl he had in his cell. Additionally, preserved food items from meals are considered contraband and staff sometimes confiscated Riley's preserved foods. (Riley provides no details about the type or amount of food he was able to preserve or how often food was confiscated.)

Riley also relied on food from the canteen. The canteen offers various food items, including meats, tuna, beans, tortillas, chili, Ramen noodles, nuts, seeds, and trail mix. During the four weeks of Ramadan, Riley received various food items from the canteen, including 18 flour tortillas, 24 packages of Ramen noodles, two containers of chili with beans, nine packages cookies, 14 packages of chips, four packages of nacho cheese dip and two boxes of saltine crackers. (The parties dispute whether Riley was limited to ordering 12 canteen items per week. Riley says he and other inmates in segregation were limited to 12 items each week, but Ewing submitted canteen records showing that Riley received 23 food items from the canteen on July 7, 2015 and 26 food items on July 14, 2015.)

Because he did not have enough food, Riley had to break his fast and eat during daylight hours on several occasions during Ramadan. (According to Riley, he lost ten pounds and suffered from dizziness and physical discomfort during Ramadan because he could not obtain sufficient calories from his canteen items and foods he saved from his meal trays. Riley says he told Ewing that he was suffering "mental and physical hardships" as a result of his attempt at self-reliant fasting, and that Ewing responded by telling him to eat the food he was being given. Ewing denies that Riley told him that he was suffering and Ewing disputes whether Riley suffered any physical harm from his fasting, arguing that that there are no medical records to

7

support Riley's contention.) Between June 2015 and August 2015, Riley submitted several health service requests regarding medical problems, but he did not mention concerns related to inadequate food, nutrition, dizziness, or weight loss.

ANALYSIS

Riley contends that Ewing violated his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act by failing to accommodate his request to participate in Ramadan in 2015. Riley also contends that Ewing's actions violated his Eighth Amendment rights because Ewing's refusal to accommodate Riley's request for Ramadan meal bags caused Riley to attempt a self-reliant fast without any way to obtain sufficient calories or nutrition. Riley has moved for summary judgment on his First Amendment and RLUIPA claims, while Ewing has moved for summary judgment on all of Riley's claims. I address the parties' arguments as to each of Riley's claims below.

**A. RLUIPA and the First Amendment**

In addressing Riley's First Amendment and RLUIPA claims, Ewing's summary judgment briefing focuses on whether the 60-day signup deadline in DAI 309.61.03 imposes a substantial burden on Riley's sincere religious practices, whether it can be justified by a legitimate penological interest, and whether it is the least restrictive means of furthering a compelling government interest. To that end, Ewing spends a significant portion of his initial brief discussing why the advance signup deadline is necessary in light of the complex planning that Food Services undertakes to accommodate the Ramadan fast and why exceptions to the signup deadline are not permitted except in rare circumstances.

However, Riley clarifies in his opposition brief that he understands why the deadline is necessary and "is not saying that the deadline in itself" is problematic. Rather, Riley contends that it was Ewing's failure to notify Riley of the 60-day signup deadline in 2015 and his refusal to make an exception to the deadline that violated Riley's rights. Dkt. 34 at 1. According to Riley, he did not meet the signup deadline because Ewing did not tell Riley and other inmates in segregation about the deadline. Riley argues that because it was Ewing's fault that Riley did not have notice of the deadline, Ewing should have made an exception and asked Food Services to add Riley to the Ramadan meal list. In light of Riley's clarification of the scope of his claims, I will focus solely on whether Ewing's failure to notify Riley of the signup deadline and refusal to make an exception to the deadline violated Riley's rights under the First Amendment or RLUIPA.

1. **RLUIPA**

RLUIPA prohibits prison officials from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). *See also Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). To prove a RLUIPA claim, the plaintiff has the initial burden to show that he has a sincere religious belief and that his religious exercise was substantially burdened. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). If the plaintiff meets this threshold, the burden then shifts to the defendants to demonstrate that their actions further "a compelling governmental interest" by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005).

In this instance, I need not determine whether Riley could succeed on the merits of his RLUIPA claim, because his claim fails for other reasons. RLUIPA authorizes only injunctive

9

relief and cannot be used to sue for damages against state officials acting in their individual capacities. *Grayson*, 666 F.3d at 451. Thus, the appropriate defendant for a RLUIPA claim is the state official who would have authority to grant injunctive relief. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). In support of his motion for summary judgment, Ewing argues that Riley's RLUIPA claim should be dismissed because Riley is not seeking injunctive relief. Instead, Riley is seeking only damages from Ewing in his personal capacity. Dkt. 26 at 6–15. Riley did not respond to Ewing's argument in any way, such as by identifying any particular injunctive relief he is seeking that Ewing would have the authority to grant. By failing to respond to Ewing's argument, Riley that has conceded that his RLUIPA claim fails based on the type of relief he seeks and the defendant he is suing. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failing to respond to argument constitutes waiver).

Even if Riley had requested injunctive relief, it appears that his request would be moot in light of the 2016 changes to DAI policy 309.61.03 that require prisons to provide notice to inmates of the signup deadlines for multiday religious dietary observances. Riley has not suggested that the amended policy fails to provide adequate notice to inmates in segregation of the dates Ramadan will be observed or the signup deadline for participating in Ramadan. *See Smith v. Exec. Dir. of Indiana War Memorials Comm'n*, 742 F.3d 282, 287 (7th Cir. 2014) (repeal of policy moots claim challenging policy unless "the policy change does not actually correct the asserted . . . problem"). For these reasons, I will grant summary judgment to Ewing on Riley's RLUIPA claim.

2. **First Amendment**

   Riley also contends that Ewing's actions violated his First Amendment right to freely exercise his religion. To establish a free exercise claim, Riley "had to submit evidence from which a jury could reasonably find that the defendant[] personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, No. 17-2980, 2019 WL 74913, at *9 (7th Cir. Jan. 2, 2019) (*quoting Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) (citing *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). In the prison context, such a burden is justified if it is "reasonably related to a legitimate penological interest." *Thompson*, 809 F.3d at 380 (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

   Ewing argues that Riley also must show that the 2015 version of DAI 309.61.03, and Ewing's actions in enforcing it, were discriminatory against Muslim inmates. The Court of Appeals for the Seventh Circuit sometimes has required prisoners bringing a free exercise claim to show that the challenged restriction targets religious exercise, in accordance with *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). *E.g., Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) ("The first amendment, by contrast, does not require the accommodation of religious practice: states may enforce neutral rules."). *See also Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015) (explaining that Congress enacted RLUIPA to provide greater religious protection because "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment"); *Grayson*, 666 F.3d at 452–53 (stating in dicta that *Smith*'s "holding should apply to prison inmates along with everyone else" and permits rules "not motivated by religious prejudices or

11

opinions"). However, in other cases, the court of appeals has not discussed whether a restriction is discriminatory. *E.g., Neely-Bey Tarik-El*, 2019 WL 74913, at *5 (setting forth elements of free exercise claim without discussing discriminatory intent); *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009) (same); *Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005) (same). *See also Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013) (stating that it is open question whether prisoner must prove discrimination in free exercise claim); *Garner v. Muenchow*, 715 F. App'x 533, 537 (7th Cir. 2017) (same). Ewing is correct that Riley has produced no evidence that DAI 309.61.03 or Ewing targeted Muslims or was motivated by religious prejudices. On the other hand, as the "Religious Diets" regulation, it is not clear that DAI 309.61.03 would qualify as a policy of "general applicability" as that term is used in *Smith* or *Holt*. However, I need not resolve this question because I conclude that Ewing is entitled to qualified immunity on this claim.

The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*citing Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

As Riley points out, it is clearly established that "forcing an inmate to choose between daily nutrition and religious practice is a substantial burden" on the inmate's religious practices that may violate the First Amendment. *Thompson*, 809 F.3d at 380 (*citing Hunafa v. Murphy*,

12

907 F.2d 46, 47 (7th Cir. 1990)). Thus, a policy that completely denied Riley the ability to fast during Ramadan, or made fasting effectively impossible, would clearly impose a substantial burden on Riley's religious practice. However, this broad conclusion does not resolve the question whether Ewing's actions under the circumstances here substantially burdened Riley's religious exercise or violated any clearly established right. When considering whether qualified immunity applies, courts cannot "define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308. The "dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Id.* (*quoting al-Kidd*, 563 U.S. at 742). In other words, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted). *See also City of Escondido, Cal. v. Emmons*, No. 17-1660, – S. Ct. –, 2019 WL 113027, at *2 (U.S. Jan. 7, 2019) ("[T]he clearly established right must be defined with specificity."); *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) ("[T]he Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987))).

As discussed above, Riley concedes that the 60-day signup deadline in DAI 309.61.03 does not impose a substantial burden on his religious practices. Instead, Riley argues that imposing a signup deadline without providing notice of it to inmates in segregation, and then refusing to provide an exception for him, placed a substantial burden on his religious exercise because it caused him to miss the signup deadline and deprived him of the opportunity to participate fully in Ramadan. Riley contends that Ewing, in his role as chaplain, is to blame for the lack of the notice.

13

It is undisputed that the 2015 version of DAI policy 309.61.03 did not require prison chaplains, or anyone else, to provide notice to inmates of the signup deadlines for participation in religious celebrations or other religious observances. The policy stated that the Religious Practices Advisory Committee will create a memo identifying the dates of religious observances and signup deadlines, but the policy said nothing about whether the memo should be distributed to inmates or who was responsible for notifying inmates of the significant dates. Chaplains were charged only with collecting dietary requests and enforcing the signup deadline. Riley's position is that, regardless what the policy required, Ewing had a responsibility under the First Amendment to provide notice of the Ramadan signup deadline or to approve Riley's untimely request to receive Ramadan meal bags.

However, Riley has cited no clearly established law stating that the prison chaplain is required by the free exercise clause to take affirmative steps to provide notice of a signup deadline for religious observances to inmates who are aware from previous years that there is a deadline and have means to determine the deadline themselves. Although Riley contends that there are two cases constituting "clearly established law" that required Ewing to notify him of the signup deadline or grant him an exception to the 60-day deadline, neither is sufficient to overcome Ewing's qualified immunity defense. First, Riley points to *Conyers v. Abitz*, 416 F.3d 580 (7th Cir. 2005), another case in which officials denied a prisoner's request to receive Ramadan accommodations on the ground that the request to participate was late. In *Conyers*, the district court had dismissed the case on the ground that the prisoner had failed to exhaust his administrative remedies, but the court of appeals disagreed. Alternatively, the defendants argued on the merits that they were entitled to enforce their signup deadline. However, the court of appeals concluded that further proceedings were necessary because the defendants'

"summary judgment evidence [wa]s too poorly developed to support a decision in their favor." *Conyers*, 416 F.3d at 585.

Although it is a close question, I conclude that *Conyers* is distinguishable for at least four reasons. First, in *Conyers*, 416 F.3d at 586, there was no evidence that the prisoner knew there was a signup deadline. In this case, it is undisputed that Riley knew there was a deadline, as he complied with the deadline in 2013 and 2014. Additionally, it is undisputed that Riley could have determined what the deadline was with minimal effort, by either looking up DAI 300.61.03 in the law library, asking Ewing in person or in writing, or asking unit staff or other inmates about the relevant dates. Second, in *Conyers*, the defendants had failed to develop evidence showing the reasons for the deadline. *Id.* at 585. In this case, Ewing submitted evidence from WSPF's Food Services explaining in detail the advance planning that is required for preparing the prisoners' meals and the advance preparation required for Ramadan meal bags in particular. Third, in *Conyers*, the court noted that the defendants had failed to explain why they denied the plaintiff's request even though they allowed late requests from prisoners who were transferred to the prison after the deadline. *Id.* In this case, Ewing explained why the prison provides accommodation to new transfers but not to persons who could have, but failed, to meet the signup deadline. In particular, Food Services is able to accommodate the approximately three inmates who are unable to meet the deadline each year, but it would have difficulty accommodating exceptions for more inmates who missed the deadline. Also, WSPF is concerned that granting additional exceptions would undermine the deadline itself. Fourth, the court's decision in *Conyers* did not discuss specifically a chaplain's personal obligations to notify inmates of a signup deadline that appears to be imposed by Food Services. Instead, the court stated generally that the prison should not have relied on a signup deadline, about which

15

the inmate did not know, to deny the inmate's right to practice his religion. *Id.* at 586. In sum, because numerous factual disputes prompted remand in *Conyers*, I am not persuaded that *Conyers* clearly established that the prison chaplain is required to provide notice of signup deadlines or grant exceptions to a signup policy under the circumstances in this case.

The second case that Riley cites is *Ajala v. West*, No. 13-cv-184-bbc, 2014 WL 6893722 (W.D. Wis. Dec. 5, 2014), which also involved a free exercise claim very similar to Riley's. As in this case, officials had denied a Muslim prisoner's request for Ramadan accommodation on the ground that the request was late. The court concluded that the defendant chaplain had provided sufficient evidence to justify the deadline and the denial of exceptions for late requests, but the court denied the chaplain's motion for summary judgment because, as in *Conyers*, there was a factual dispute about whether the prisoner had adequate notice of the signup deadline. *Id.* at *2. After the court's summary judgment decision, the parties in *Ajala* settled the prisoner's claims.

Although the *Ajala* case involved a claim very similar to Riley's, Riley's citation to the *Ajala* decision is not sufficient to overcome Ewing's qualified immunity defense for two reasons. First, law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). The district-court *Ajala* decision is not controlling and does not qualify as "a consensus of persuasive authority" regarding the First Amendment obligations of a prison chaplain. Second, the *Ajala* decision did not discuss qualified immunity or discuss whether it mattered that prisoners had other means to determine the signup deadline besides relying on notification from the chaplain or general institution-wide announcements. For these reasons, a reasonable

16

chaplain in Ewing's position would not have understood *Ajala* as requiring him to provide notice of the 60-day signup deadline or grant an exception to a prisoner under the circumstances present here. Accordingly, I will grant summary judgment to Ewing on Riley's First Amendment claim.[1]

**B. Eighth Amendment**

Riley also contends that his Eighth Amendment rights were violated when Ewing refused to accommodate his requests to receive Ramadan meal bags and forced Riley to carry out a self-reliant fast for the entire month of Ramadan. The Eighth Amendment requires that prison officials provide humane conditions of confinement, which include the basic necessities of life such as clothing, shelter, medical care, and food that provides adequate nutrition. *Farmer v. Brennan*, 511 U.S. 825, 832, (1994); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009). A prisoner can succeed on an Eighth Amendment claim by showing that a prison official exhibited deliberate indifference to a substantial risk of serious harm to the prisoner's health by denying him access to adequate and nutritious food. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). Here, Riley contends that Ewing was deliberately indifferent to the physical and mental pain that Riley suffered as a result of being unable to obtain sufficient food from the canteen or from his regular meal trays to provide him with adequate calories and nutrition during the month of Ramadan.

Ewing contends that the prison's only obligations under the Eighth Amendment are to provide adequate food and that, because Riley received three nutritious meals during Ramadan,

---

[1] Because I conclude that Ewing is entitled to qualified immunity on Riley's First Amendment claim, I need not consider Ewing's remaining arguments regarding whether DAI policy 309.61.03 withstands scrutiny under *Turner*.

his Eighth Amendment claim fails. Several district courts have accepted this argument, concluding that a prisoner's decision to abstain from eating nutritious food for religious reasons may implicate the First Amendment or RLUIPA, but does not implicate the prison's obligation under the Eighth Amendment to provide adequately nutritious food. *See, e.g.*, *Harris v. Cearlock*, No. 17-CV-3307-JBM, 2018 WL 5777472, at *2 (C.D. Ill. Nov. 2, 2018); *Wallace v. Miller*, No. 09-CV-342-JPG, 2010 WL 2836987, at *5 (S.D. Ill. July 20, 2010); *Crawford v. Bukowski*, No. 10-CV-2242, 2013 WL 363923, at *5 (C.D. Ill. Jan. 30, 2013); *Powell v. Raemisch*, No. 10-CV-202-BBC, 2010 WL 2429709, at *7 (W.D. Wis. June 11, 2010). This conclusion makes some sense. Assuming it is permissible under the First Amendment for prisons to impose reasonable administrative requirements on a prisoner's ability to participate in religious dietary observances, as Riley concedes that it is, permitting an Eighth Amendment claim for a prisoner who fails to abide by the administrative requirements and then refuses to eat the food they are provided on religious grounds would render the administrative requirement meaningless. As the above courts recognize, such claims should be resolved based on the legality of the administrative requirements under the First Amendment and RLUIPA. *See Conyers*, 416 F.3d at 586 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989), for the proposition that "constitutional claims must be addressed under the most applicable provision").

On the other hand, there may be some situations in which a prisoner's refusal to eat certain foods for religious reasons presents such a substantial risk of serious harm to the prisoner's health that the Eighth Amendment would require prison officials to intervene and take some steps to protect the prisoner's health and safety. But this is not one of those cases. Riley says that he did not want to eat the food provided to him because wanted to maintain his fast for Ramadan, so he tried to preserve foods from his regular meals, bought food from

18

the canteen, though not the most nutritious options available, and occasionally broke his fast. He says that he told Ewing that he was suffering "mental and physical hardships" from the situation, and Ewing responded by telling him to eat more food from his meal trays. These facts do not suggest that Ewing was deliberately indifferent to a substantial risk of serious harm to Riley's health or safety. In particular, Riley does not say that he told Ewing that he was losing weight, experiencing dizziness, or suffering any particular harm that Ewing would have considered to be a serious risk to Riley's health. Ewing also did not receive notice from the Health Services Unit that Riley's health was at risk, as Riley did not notify Health Services that he was experiencing any physical harm as a result of his self-reliant fast. Therefore, Riley has failed to submit evidence from which a reasonable jury could conclude that Ewing was deliberately indifferent to his health or safety. Accordingly, Ewing is entitled to summary judgment on Riley's Eighth Amendment claim.

**C. Riley's remaining motions**

Since filing his motion for partial summary judgment, Riley filed several motions asking that the court issue orders on outstanding motions. Dkts. 41, 45, 48, 49, and 66. He also requested that the court order mediation of his claims. Dkts. 61, 64. Because I am resolving all of the outstanding motions in this opinion and grating summary judgment in defendant's favor, I will deny Riley's motions for the issuance of orders and for mediation as moot.

Riley also filed several motions for assistance in recruiting counsel. Dkts. 44, 53, 63. He states that the case is too complex for him to litigate on his own, that he has limited legal knowledge and limited access to the law library, and that he could not handle a trial without help. In determining whether to recruit counsel for a pro se litigant, the relevant question is

whether the complexity of the case exceeds the plaintiff's ability to litigate it. *Pruitt v. Mote*, 503 F.3d 647, 653 (7th Cir. 2007).

In this instance, I am not persuaded that this case was too complex for Riley to litigate on his own. Riley's claims relate to a single incident involving one defendant. He managed to draft and file his own motion for summary judgment that was supported by relevant evidence and legal authority. He also filed a clear and articulate response to Ewing's motion for summary judgment. Riley's claims failed not because of he was unable to conduct discovery or present his legal arguments clearly, but because the facts and the law are not in his favor. I am not persuaded that the outcome would have been different if Riley had been represented by counsel.

ORDER

IT IS ORDERED that:

1. Plaintiff Shawn Riley's motion for partial summary judgment, Dkt. 19, is DENIED.

2. Defendant Chaplain Ewing's motion for summary judgment, Dkt. 25, is GRANTED.

3. Plaintiff's motions for issuance of orders, Dkts. 41, 45, 48, 49, and 66, are DENIED as moot.

4. Plaintiff's motions for assistance in recruiting counsel, Dkts. 44, 53, and 63, and motions to order mediation, Dkt. 61 and Dkt 64, are DENIED.

Entered January 14, 2019.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge